UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Daniel W.,

    Plaintiff,

    v.

Kilolo Kijakazi, Acting Commissioner of the
Social Security Administration,

    Defendant.

Civil Action No. 2:22–cv–88

## <u>AMENDED OPINION AND ORDER</u>
(Docs. 15, 17)

Plaintiff Daniel W. brings this action pursuant to 42 U.S.C. § 405(g) of the Social

Security Act, requesting review and remand of the decision of the Commissioner of Social

Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI).  Pending before the Court are Plaintiff's motion to reverse the

Commissioner's decision (Doc. 15), and the Commissioner's motion to affirm the same (Doc.

17).  For the reasons stated below, Plaintiff's motion is granted, the Commissioner's motion is

denied, and the matter is remanded for further proceedings and a new decision.

## <u>Background</u>

Plaintiff was twenty-one years old on his alleged disability onset date of April 15, 2019.

He has a high school education and a student certification as a mechanic.  Plaintiff has held

various short-term jobs, including as a grocery store cashier, a dishwasher, a stocker, and a

vehicle cleaner.  He lives with his mother and siblings in Jericho, Vermont.

Plaintiff was born with a congenital limb defect leading to amputation of his right leg below the knee when he was two years old and subsequent use of a prosthetic leg.  Plaintiff's prosthesis fit properly at first, allowing Plaintiff to be an "extremely active" young child.  (AR 638.)  But starting in high school, Plaintiff began to have issues with the prosthesis, as his right femur growth lagged behind the left.  (AR 809.)  He underwent three subsequent right knee surgeries, physical therapy, and many prosthesis adjustments, all "without great success."  (*Id.*; *see also* AR 436, 438, 442–44, 634–41, 764–69, 780, 796.)  Plaintiff claims his leg length discrepancy and improperly fitted prosthesis have caused him chronic right knee and hip pain, preventing him from sleeping well and doing any activity for a sustained period of time.  (AR 815.)

Plaintiff also has scoliosis and depression and anxiety due to his chronic pain and functional limitations.  In a June 2019 Disability Report, Plaintiff stated that he was unable to work because his leg was causing him "so much pain."  (AR 295.)  In a September 2019 Report, Plaintiff reported that his condition had worsened, stating: "My pain has increased as I continue to have a prosthetic that is not working.  I have so much pain.  Sleeping is very difficult."  (AR 116.)  Plaintiff further stated that he was "really depressed" due to his lack of sleep and lack of mobility.  (*Id.*)  At his March 2021 administrative hearing, Plaintiff testified that he was unable to stand on his prosthetic leg for long periods due to pain and discomfort in the prosthesis; in the location of his surgical scar; and in his knee, hip, shoulder, and neck on both sides of his body.[1] (AR 61.)  He explained that he did not walk a lot because his left lower limb was "very irritated

---

[1] Plaintiff's recorded testimony during the March 2021 administrative hearing is incomprehensible in parts, presumably because of technical problems in the recording; and "[INAUDIBLE]" is written multiple times in the record in place of Plaintiff's testimony.  (*See, e.g.*, AR 62 ("I have a bad - - with my prosthetic I was multiple bowls in line there"); AR 63 ("I have two [INAUDIBLE] anxiety all the time"), ("I make a long way back to my question here high school, I first got the title [INAUDIBLE] and I was the [INAUDIBLE] and I was being late to class").)  If another hearing occurs on remand, it should either be conducted in person or, if done virtually, the ALJ should ensure that technical issues do not prevent Plaintiff's testimony from being accurately heard and recorded.

and sore," and he had "rashes" on his skin.  (AR 62.)  Plaintiff's mother added that Plaintiff experienced a "sharp decline" in both his physical and mental health since he graduated from high school, experiencing "significantly more pain" and a dramatic increase in his depression and anxiety.  (AR 378.)  Plaintiff's mother stated that she and Plaintiff were working with doctors to try to help Plaintiff, "but progress [wa]s really slow."  (*Id.*)

Regarding his mental health, Plaintiff testified that he "get[s] irrational and . . . [has] panic attacks."  (AR 63.)  He noted that he sometimes "get[s] a little discouraged" at medical appointments, or "get[s] in a weird mood and can't help, and [he] . . . get[s] upset and cri[es]." (AR 64.)  The record supports these statements, documenting several incidents of Plaintiff shutting down at medical appointments.  For example, at a February 2020 appointment with Certified Prosthetist (CP) Jason Lalla to check the fitting of his prosthesis, Plaintiff "crawled up on [a] chair[] and pulled [his] hood up over his head," said the appointment was a "waste of time," and "stormed out."  (AR 640.)  CP Lalla ended the appointment by stating: "[I]f he is not willing to give us feedback and continues to shut down[,] . . . we would not be successful in fitting him [with a prosthetic]."  (*Id.*)  Similarly, a July 2020 prosthetic-fitting appointment with CP Lalla ended with Plaintiff crying in the office lobby and violently leaving the office, causing damage to a door.  (AR 804.)  Thereafter, CP Lalla terminated Plaintiff as a patient, noting that Plaintiff had "basically refused care and/or made it impossible to work with him."  (AR 803.)  In April 2020, after reviewing the medical records, agency consultant Thomas Reilly, PhD, noted that Plaintiff was minimally communicative at medical appointments and his general demeanor suggested depressed mood.  (AR 151.)  He further stated that Plaintiff "seems to feel stuck in a loop related to his pain from [an] ill[-]fitting prosthetic[,] making it impossible to work[]and

difficult to make changes in his life." (*Id.*)  Dr. Reilly concluded that Plaintiff's psychological issues were limiting his ability to find a better prosthetic match.  (*Id.*)

Plaintiff filed his application for DIB in June 2019, asserting that he stopped working on April 29, 2019 due to his "below knee amputation of [the] right leg" and depression.  (AR 290.) Plaintiff explained that his prosthetic leg, and specifically his "disproportionate knees, length of limbs, and hips," limited his ability to work.  (AR 329.)  He reported that his typical day involved stretching/exercising, researching on the computer, going outside, watching television, eating meals, and sleeping.  (AR 330.)  At his March 2021 administrative hearing almost two years later, Plaintiff testified that his typical day had not changed, involving "researching . . . to keep up with [his] appointments with [his] doctors" (AR 57); stretching; sitting down, standing up, and moving around because he "can't . . . stay in one position for too long" (*id.*); talking to his mother; eating dinner with his family; and researching online to try to find a job and "ways to make money and figure out life" (AR 60).

Plaintiff's disability application was denied initially and upon reconsideration, and Plaintiff timely requested an administrative hearing.  On March 3, 2021, Administrative Law Judge (ALJ) Thomas Merrill conducted a hearing on the application.  (AR 50–76.)  Plaintiff appeared and testified, and was represented by counsel.  A vocational expert (VE) also testified at the hearing.  (AR 65–75.)  On March 23, 2021, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act from his alleged disability onset date of April 15, 2019 through the date of the decision.  (AR 10–26.)  The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1– 9.)  Having exhausted his administrative remedies, Plaintiff filed the Complaint in this action on April 29, 2022.  (Doc. 3.)

## ALJ Decision

The Commissioner employs a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four. *Butts*, 388 F.3d at 383. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the

Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

ALJ Merrill first determined that Plaintiff had not engaged in substantial gainful activity since April 15, 2019, his alleged disability onset date.  (AR 12.)  The ALJ noted that, although Plaintiff had earnings from the second quarter of 2019, the work activity was "limited" and did not rise to the level of "substantial gainful activity."  (*Id.*)  At step two, the ALJ found that Plaintiff had the severe impairments of "below the knee amputation of the right leg," depressive disorder, and anxiety disorder.  (AR 13.)  In contrast, the ALJ found that Plaintiff's scoliosis was "mild" and therefore not a severe impairment.  (*Id.*)  At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 13–16.)

Next, the ALJ determined that Plaintiff had the RFC to perform "light work," but with the following limitations:

> [Plaintiff has] the ability to lift/carry up to 20 pounds occasionally, 10 pound[s] frequently; stand/walk for up to 4 hours, and sit for up to 6 hours, in an 8-hour workday; unlimited use of hands and feet to operate machines and push/pull; never climb ladders, scaffolding, or rope; unlimited ability to stoop; [and] occasionally climb stairs and ramps, balance, kneel, crouch and crawl.  [Plaintiff] is limited to understanding, remembering[,] and carrying out simple tasks, and is able to sustain concentration, persistence[,] or pace for typical 2-hour periods, for an 8-hour workday/40-hour workweek for simple tasks.  He is able to tolerate the ordinary social interactions of unskilled work.

(AR 16.)  At step four, the ALJ found that Plaintiff had no "past relevant work."  (AR 24.)  At the final fifth step, however, relying on testimony from the VE, the ALJ found that Plaintiff was capable of performing jobs existing in significant numbers in the national economy, including the representative occupations of price marker, small product assembler, document preparer, eyeglass polisher, and surveillance system monitor.  (AR 25.)  The ALJ concluded that Plaintiff

had not been under a disability from the alleged disability onset date of April 15, 2019, through the date of the decision.  (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.

The substantial evidence standard is "very deferential," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted); *see Sesa v. Colvin*, 629 F. App'x 30, 31 (2d Cir. 2015).   Nonetheless, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff contends that his claim should be remanded for the following reasons: (1) the ALJ's finding that Plaintiff could stand/walk for up to four hours is not supported by substantial evidence; (2) the ALJ should have limited Plaintiff to one- to two-step tasks in low production jobs; (3) the ALJ erred in his step-five finding that there are jobs existing in significant numbers in the national economy that Plaintiff can perform; and (4) the ALJ's statement that Plaintiff's date last insured (DLI) is June 30, 2019 is incorrect.  (*See* Docs. 15-1, 19.)  The Commissioner opposes each of these arguments, and claims that the ALJ's decision is supported by substantial evidence and applies the correct legal standards.  (*See* Doc. 17.)

## I.      Standing/Walking Limitations

The ALJ's RFC determination includes a finding that Plaintiff could stand/walk for up to four hours in an eight-hour workday.  (AR 16.)  This finding reflects the ALJ's assessment that the opinions of nonexamining agency consultants Geoffrey Knisely, MD and Elizabeth White, MD, are "persuasive" (AR 21), and the opinion of treating physician Craig Bartlett, MD is "not persuasive" (AR 23).  Dr. Knisely reviewed the record in August 2019 and opined that Plaintiff could "[s]tand and/or walk (with normal breaks)" for a total of four hours.  (AR 89, 107.)  Dr. White, on the other hand, reviewed the record in March 2020 and opined that Plaintiff could

"[s]tand and/or walk (with normal breaks)" for a total of only two hours.  (AR 132, 155.)

Dr. White explained that this assessment was "based on [Plaintiff's] continued difficulty with

[his] prosthesis[,] causing pain and abnormal gait."  (AR 133, 156.)  About a month later in April

2020, nonexamining agency consultant Nancy Armstrong, MD, agreed with Dr. White's

assessment.[2]  (AR 696–97.)  The ALJ recognized Dr. White's opinion that Plaintiff could

stand/walk for only two hours—in contrast with Dr. Knisely's opinion that Plaintiff could

stand/walk for four hours—but nonetheless analyzed the opinions of Dr. White and Dr. Knisely

as if they were the same, finding them both "persuasive."  (AR 21.)  Yet clearly, the ALJ did not

find Dr. White's opinion that Plaintiff could stand/walk for *two* hours persuasive, because the

ALJ's RFC determination includes a finding that Plaintiff could stand/walk for *four* hours (AR

16), as Dr. Knisely—and not Dr. White—opined.  The ALJ does not explain his decision to find

Dr. White's (and Dr. Armstrong's) opinion that Plaintiff could stand/walk for only two hours

"not persuasive," other than simply stating: "[T]he undersigned finds [Plaintiff] has the capacity

for [four] hours of standing/walking, as noted by Dr. Knisely."  (AR 22.)

     Similarly, the ALJ does not adequately explain why he found treating physician

Dr. Bartlett's opinion that Plaintiff could stand/walk for *less than two hours* "not persuasive."

(AR 23.)  In October 2020, about seven months after Dr. White made her assessment that

---

[2] Plaintiff states that the record contains "a checkbox agreement" authored by "state agency non-reviewing medical consultant Nancy Armstrong, M.D.," which agrees with another agency consultant's assessment, presumably that of Dr. White.  (Doc. 15-1 at 15, ¶ 58 (citing AR 696) ("It is believed that Dr. Armstrong['s] agreement was with Dr. White's more recent assessment that [Plaintiff] was limited to [two] h[ou]rs walking and standing.").)  Likewise, the ALJ states in his decision that Dr. White's assessment "was affirmed by another [s]tate agency medical consultant, Nancy Armstrong, M.D." (AR 22), and the Commissioner states the same in her motion to affirm (*see* Doc. 17-1 at 3, ¶ 58a ("Dr. Nancy Armstrong, a [s]tate agency medical consultant, reviewed the medical evidence of record on April 20, 2020 and affirmed Dr. White's assessment.").  It is unclear from the relevant record itself—specifically, the document signed by Dr. Armstrong and titled "Medical Consultant's Review of Physical [RFC] Assessment"—which assessment Dr. Armstrong reviewed: nowhere in the "Medical Consultant's Review" does Dr. Armstrong reference Dr. White's assessment, nor does the Review reference Dr. White's particular opinion about Plaintiff's ability to stand/walk.  (*See* AR 696–97.)  Nonetheless, given that both parties and the ALJ agree that Dr. Armstrong's review was of Dr. White's assessment, the Court accepts that as fact for purposes of ruling on the pending motions.

Plaintiff could stand/walk for only two hours, Dr. Bartlett similarly found that Plaintiff could stand and/or walk for "less than [two] hours in an [eight]-hour workday." (AR 701.) The ALJ does not adequately explain his decision to find the opinions of Dr. Bartlett and Dr. White less persuasive than the opinion of Dr. Knisely with respect to Plaintiff's ability to stand/walk, especially considering that: (a) Dr. Bartlett examined and treated Plaintiff,[3] whereas Dr. Knisely merely reviewed the record; (b) Dr. Bartlett made his opinion later than Dr. Knisely made his, considering a more complete record than Dr. Knisely considered; and (c) Dr. Bartlett's opinion is more supported and consistent with the record than Dr. Knisely's, as discussed in detail below.

Because Plaintiff's claim was filed after March 2017,[4] the regulations require that the ALJ consider "all of the medical opinions" in the record, 20 C.F.R. §§ 404.1520c(b),

---

[3] Dr. Bartlett saw Plaintiff on referral from Jessica Johnson, MD, a specialist in physical medicine and rehabilitation, after Dr. Johnson consulted with Jennifer Lisle, MD, a pediatric orthopedist, about Plaintiff's case. (*See* AR 809, 815.)

[4] For social security claims filed before March 27, 2017, the Social Security Administration's regulations mandated application of the "treating physician rule," which required an ALJ to give more weight to the opinions of "treating sources," meaning medical sources who provided the claimant with medical treatment or evaluation and had an ongoing treatment relationship with the claimant, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (holding that the Social Security Administration "recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant" (internal quotation marks omitted)); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("The [regulations] give[] special evidentiary weight to the opinion of the treating physician."). Under the treating physician rule, an ALJ was required to "give good reasons" if he determined that a treating source's opinion was not entitled to either "controlling weight" or, at least, "more weight" than the opinions of non-treating and non-examining sources, 20 C.F.R. §§ 404.1527(c)(1)–(2), 416.927(d)(1)–(2), and a consultative physician's opinion was generally entitled to "little weight," *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

On January 18, 2017, the Social Security Administration published comprehensive revisions to the regulations regarding the evaluation of medical evidence for applications filed on or after March 27, 2017. *See Revisions to the Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5869-70, 2017 WL 168819 (Jan. 18, 2017). In implementing these new regulations, the Social Security Administration "has apparently sought to move away from a perceived hierarchy of medical sources." *Velasquez v. Kijakazi*, 19cv9303 (DF), 2021 WL 4392986, at *19 (S.D.N.Y. Sept. 24, 2021) (citing 82 Fed. Reg. 5844). The new regulations state that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider all medical opinions in the record and "evaluate the[ir] persuasiveness," 20 C.F.R. §§ 404.1520c(a), 416.920c(a), based on five "factors" discussed further in this Opinion and Order.

416.920c(b), based on the following five factors: (1) whether the opinion is supported by objective medical evidence and supporting explanation; (2) whether the opinion is consistent with evidence from other medical and nonmedical sources; (3) the medical source's relationship with the claimant, including the length of treatment, frequency of visits, purpose for treatment, kinds and extent of examination and testing performed or ordered, and whether the source examined the claimant or merely reviewed the evidence; (4) whether the source has advanced education and training in the relevant area of specialty; and (5) "other factors that tend to support or contradict a medical opinion." *Id.* §§ 404.1520c(c), 416.920c(c).  Among these factors, the "most important" in "evaluat[ing] the persuasiveness of medical opinions" are "supportability" and "consistency." *Id.* §§ 404.1520c(a), 416.920c(a); *see id.* §§ 404.1520c(b), 416.920c(b).

Notwithstanding the requirement to consider these factors, the ALJ's duty to articulate a rationale for each factor varies.  *See id.* §§ 404.1520c(a)–(b), 416.1520c(a)–(b).  In all cases, the ALJ must explain "how [he] considered" both the supportability and consistency factors, as they are "the most important factors." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2); *see Amber H. v. Saul*, 3:20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) (noting that "[t]he two most important factors for determining the persuasiveness of medical opinions are consistency and supportability, which are the same factors that formed the foundation of the treating source rule" (internal quotation marks omitted)).  With respect to the supportability factor, "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." *Vellone v. Saul*, 1:20-cv-00261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)); *see Rivera v. Comm'r of Soc. Sec.*, 19-CV-4630 (LJL) (BCM), 2020 WL 8167136 (S.D.N.Y. Dec. 30, 2020), at *16 (noting that supportability "has to do with the fit

between the medical opinion offered by the source and the underlying evidence and explanations 'presented' by that source to support her opinion" (quoting 20 C.F.R. § 416.920c(c)(1))).  As for the consistency factor, the greater the consistency between a particular medical opinion and the other evidence in the record, the more persuasive that opinion is.  *Vellone*, 2021 WL 319354, at *6 (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)) (noting that the consistency factor "is an all-encompassing inquiry focused on how well a medical [opinion] is supported, or not supported, by the entire record").  The ALJ is required to consider the three remaining factors— including the medical source's specialization and relationship with the claimant, and any "other factors"—but there is no requirement that the ALJ explicitly discuss these factors in determining the persuasiveness of the opinion of a medical source.  *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b)(2).

Accordingly, "[a]lthough the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion[;] the ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions.'"  *Andrew G. v. Comm'r of Soc. Sec.*, 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (third, fourth, and fifth alteration in original) (quoting 20 C.F.R. §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1)).  Remand is required if the ALJ fails to adequately explain the supportability or consistency factors.  *See, e.g., id.* at *5–9; *see also Rivera*, 2020 WL 8167136, at *14–17.  District courts in this Circuit that have considered the new regulations regarding ALJ evaluation of medical source opinions have concluded that "the factors are very similar to the analysis under the old [treating physician] rule."  *Velasquez*, 2021 WL 4392986, at *20 (quoting *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); *see also Acosta Cuevas v. Comm'r of Soc. Sec.*,

20-CV-0502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (collecting cases

considering the new regulations and concluding that the "essence" of the treating physician rule

"remains the same, and the factors to be considered in weighing the various medical opinions in

a given claimant's medical history are substantially similar"), *report and recommendation*

*adopted*, 2022 WL 717612 (Mar. 10, 2022).  "This is not surprising considering that, under the

old rule, an ALJ had to determine whether a treating physician's opinion was *supported* by well-

accepted medical evidence and *not inconsistent* with the rest of the record[,] before controlling

weight could be assigned."  *Acosta Cuevas*, 2021 WL 363682, at *9.

The ALJ did not follow the applicable regulatory requirements in his evaluation of the

opinions of Dr. Bartlett, Dr. White, and Dr. Knisely with respect to Plaintiff's ability to

stand/walk.  Further, the ALJ's assessment of these opinions is not supported by substantial

evidence.  Regarding his assessment of Dr. Bartlett's opinion, the ALJ should have considered

the following factors: (1) whether the opinion is supported by objective medical evidence,

including x-rays, demonstrating Plaintiff's limb length discrepancy and leg shortening (*see, e.g.*,

AR 810); (2) whether the opinion is consistent with Plaintiff's testimony (*see* AR 61–62, 329),

Plaintiff's mother's testimony (*see* AR 378), and the opinions of other medical sources including

nonexamining agency consultants Dr. White (*see* AR 132, 155) and Dr. Armstrong (*see* AR 696–

97), and examining medical sources including agency consultant Dr. Richard Morrison, who

noted that Plaintiff "was missing a bone in his leg[, which] affects his gait" and "walks with a

limp" (*see* AR 560); (3) Dr. Bartlett and Plaintiff had a treatment relationship, where Dr. Bartlett

met with Plaintiff on at least two occasions, performed a thorough physical examination of

Plaintiff, and ordered x-rays of Plaintiff's right leg (*see* AR 805–11); and (4) Dr. Bartlett is an

orthopedic surgeon, opining on subjects within his area of medical specialty, including prosthesis and leg deformity surgery (*see* AR 806).

Regarding the first factor, the x-rays that Dr. Bartlett ordered and reviewed showed, according to Dr. Bartlett, that Plaintiff has "substantial shortening of his right femur with a little bit of varus[5] noted on the right as well as some shortening of his tibia." (AR 810.) Dr. Bartlett further explained that the x-rays showed "a very dysplastic[6] knee with dysplastic femoral condyles, a posterolateral dislocation of his patella, and his femoral condyles also appeared to be somewhat flattened." (*Id.*) Accordingly, in his Medical Source Statement (MSS), Dr. Bartlett opined that Plaintiff had "severe [l]imb length discrepancy" and "[s]evere [l]eg [s]hortening." (AR 699; *see also* AR 700.) Dr. Knisely did not consider these x-rays, or Dr. Bartlett's findings regarding the x-rays, because Dr. Knisely reviewed the record and formed his opinion over one year before Dr. Bartlett examined Plaintiff, ordered the x-rays, and rendered his opinion about Plaintiff's ability to stand/walk.

The ALJ did not give good reasons for finding Dr. Knisely's opinion regarding Plaintiff's ability to stand/walk persuasive. He explained that he found Dr. Knisely's opinion persuasive "in light of [Dr. Knisely's] medical expertise, knowledge of Social Security disability regulations[,] and . . . thorough review of the medical records, with citations to the evidence to support [his] findings," as well as because Dr. Knisely's opinion was consistent with the record and supported by Plaintiff's daily activities. (AR 22.) Without citing to specific evidence, the ALJ further stated that he found Dr. Knisely's standing/walking assessment persuasive because it

---

[5] "Varus" means "any joint in an extremity that is deformed in such a way that the more distal of the two bones forming the joint deviates toward the midline, as in bowleg." *Stedman's Medical Dictionary* 969160 (2014 update) (Westlaw).

[6] "Dysplastic" means "[p]ertaining to or marked by dysplasia," which means "[a]bnormal tissue development." *Stedman's Medical Dictionary* 274350 (dysplastic), 273730 (dysplasia) (2014 update) (Westlaw).

was made "[i]n light of additional medical records submitted since [his] review[][,] showing [Plaintiff's] ability to ambulate adequately." (*Id.*) However, a comparison of Dr. Knisely's and Dr. Bartlett's opinions regarding Plaintiff's ability to stand/walk reveals that Dr. Bartlett's opinions are in fact better supported, more consistent with the record, and generally more persuasive considering the relevant factors. First, although the ALJ noted that Dr. Knisely had medical expertise in the area of Social Security disability regulations, Dr. Bartlett specializes in the medical area under review[7]—orthopedics and prosthetics—a more meaningful specialization for purposes of assessing Plaintiff's ability to stand/walk than Dr. Knisely's knowledge of the relevant Social Security regulations. Second, while Dr. Knisely "thorough[ly] review[ed]" (AR 22) the medical evidence existing in the record at the time he formed his opinion on Plaintiff's ability to stand/walk (in August 2019), Dr. Bartlett formed his opinions over a year later (in October 2020), by which time over 400 additional pages of medical evidence had been added to the record, including medical records documenting Plaintiff's shortened right leg and deformed right knee, both of which contributed to Plaintiff's pain, abnormal gait, and difficulty achieving a proper fit for his prosthesis.

The ALJ also did not give good reasons for finding Dr. Bartlett's opinion regarding Plaintiff's ability to stand/walk not persuasive. First, the ALJ stated that Dr. Bartlett's opinion was not persuasive because Dr. Bartlett used a "check-off form" to opine that Plaintiff could stand/walk for less than two hours in an eight-hour workday. (AR 23.) It is true that Dr. Bartlett's opinion regarding Plaintiff's ability to stand/walk is in the form of a checkmark in

---

[7] In fact, the record indicates that Dr. Bartlett has performed "several hundred intramedullary nailings for leg fractures as well as several hundred deformity surgeries over [his] 23 years as an [orthopedic surgeon]." (AR 806.) "Intramedullary nailing" is a "surgery to repair a broken bone and keep it stable," where "[a] permanent nail or rod is placed into the center of the bone" to assist the patient with being able to put weight on the bone. *Intramedullary Nailing*, DRUGS.COM, https://www.drugs.com/cg/intramedullary-nailing.html (last updated May 1, 2023).

a box next to a statement that Plaintiff was able to "stand and/or walk" for "less than [two] hours in an [eight]-hour workday."  (AR 701.)  The Second Circuit has observed that a treating physician's checkmark opinion on a standardized multiple-choice form is "not particularly informative."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  In *Halloran*, however, the relevant opinion appears not to have contained any explanation at all aside from the check marks.  More importantly, *Halloran* found that the checkmark opinion was "not consistent" with other substantial evidence in the record.  *Id.*  This case is different on both counts.

Further, a treating physician's use of these types of forms "does not automatically render a treating physician's opinion unworthy of any consideration," *Torres v. Saul*, Civil No. 3:19-cv-01160-TOF, 2020 WL 6144658, at *8 (D. Conn. Oct. 20, 2020), particularly where the ALJ does not seek additional information to substantiate the opinions contained in the form, *see Busby v. Berryhill*, Civil No. 3:16CV664 (AWT), 2017 WL 3575893, at *4 (D. Conn. Aug. 18, 2017) ("It is . . . noteworthy that the ALJ gave no weight to [the treating physician's] opinions because . . . the doctor merely put checkmarks to primarily subjective symptoms, but had the ALJ sought additional information because he felt the clinical findings were inadequate, such information would have been provided, as evidenced by [the treating physician's report]." (citation and internal quotation marks omitted)).  *See Colgan v. Kijakazi*, 22 F.4th 353, 361 (2d Cir. 2022) (stating that *Halloran* "does not . . . stand for the rule that the evidentiary weight of a treating physician's medical opinion can be discounted by an ALJ based on the naked fact that it was provided in a check-box form," and holding that "the nature of an ALJ's inquiry in disability factfinding turns on the substance of the medical opinion at issue—not its form—and ultimately whether there is reasonable evidence in the record that supports the conclusions drawn by the medical expert").

Second, the ALJ states that Dr. Bartlett's opinion is not persuasive because it is "vague and conclusory, with no citations to objective medical evidence to support [it]."  (AR 23.)  On its face, Dr. Bartlett's opinion that Plaintiff was limited to standing and/or walking for less than two hours in an eight-hour workday is not vague.  Moreover, although Dr. Bartlett did not cite to supporting objective medical evidence in his MSS, he noted that his opinion was based on Plaintiff's "severe [l]imb length discrepancy" and "[s]evere [l]eg [s]hortening" (AR 699, 700).  These findings are clearly based on Dr. Bartlett's October 6, 2020 physical examination and x-rays of Plaintiff's right leg (*see* AR 810).

Third, the ALJ states that Dr. Bartlett's opinion is not persuasive because it is about "an issue reserved to the Commissioner, and [Dr. Bartlett] declined to [answer] many of the questions on the form, noting it was not in his 'realm' and [Plaintiff] should have functional testing."  (AR 23.)  Dr. Bartlett's decision not to opine on issues he did not feel qualified to assess, including whether Plaintiff's prescribed medications would adversely affect his ability to work (AR 702), does not warrant discounting the opinions Dr. Bartlett is particularly qualified to render, such as his patient's functional ability to stand and walk.  In cases where the medical source indicates an inability to assess a plaintiff's performance in certain categories, that does not provide "a sufficient basis to discount [the medical source's] opinion as to other categories" that the source was qualified to opine on.  *Rucker v. Kijakazi*, 48 F.4th 86, 93 (2d Cir. 2022).

With respect to Dr. Bartlett's statement that Plaintiff is "clearly disabled" (AR 699), medical opinions on issues reserved to the Commissioner, such as the conclusion that the claimant is disabled, are not determinative or entitled to special weight based on the source of the opinion.  *See Snell v. Apfel*, 177 F.3d 128, 133–34 (2d Cir. 1999) ("The final question of disability is . . . expressly reserved to the Commissioner.").  Nevertheless, the Commissioner

may not disregard a treating physician's opinions on these issues.  *Id.* at 134.  "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt [ALJs] from their obligation . . . to explain why a treating physician's opinions are not being credited."  *Id.*

Fourth, the ALJ found Dr. Bartlett's opinion not persuasive because it was "inconsistent with the opinion of Dr. Morrison."  Richard Morrison, MD, is a general practitioner who performed a one-time consultative examination of Plaintiff in August 2019 at the request of the Social Security Administration.  (*See* AR 558–60.)  Dr. Morrison noted that Plaintiff could stand for "about [thirty] seconds comfortably" and sit for ten minutes.  (AR 558.)  He observed that Plaintiff's affect was "blank and bordering on hostility" (*id.*), and that Plaintiff had an "[a]bnormal gait because of [his] amputation and prosthesis" (AR 559).  Some of Dr. Morrison's "Overall Impressions" were that Plaintiff has a "[r]ight leg below-the-knee amputation"; Plaintiff is "missing a bone in his leg" that "affects his gait"; Plaintiff's prosthesis "needs repair"; Plaintiff has depression and anxiety with panic attacks; Plaintiff has a "[v]ery bland, hostile, and confused presentation concerning his self-image"; Plaintiff's stump "has some redness and rash but no tissue breakdown"; and Plaintiff "walks with a limp."  (AR 560.)  Opining on an issue reserved for the Commissioner, Dr. Morrison concluded that although Plaintiff "certainly has some [physical] problems," he "could be an effective person in the workforce."  (*Id.*)  But, again opining on an issue reserved for the Commissioner, Dr. Morrison noted that Plaintiff would not be able to hold a job "with his current mental attitude."  (*Id.*)

Dr. Morrison examined Plaintiff only once and did not make any opinions on the particular issue of Plaintiff's ability to stand or walk.  Like Dr. Bartlett, Dr. Morrison recognized that Plaintiff was missing a bone in his leg which affected his gait, walked with a limp, and had a

stump with some redness and a rash.  It is unclear why the ALJ found Dr. Morrison's opinion

inconsistent with Dr. Bartlett's opinion regarding Plaintiff's ability to stand/walk.  Furthermore,

the ALJ did not recognize that Dr. Bartlett was an orthopedic surgeon who thoroughly examined

Plaintiff for the purpose of recommending and possibly providing medical treatment (surgery),

whereas Dr. Morrison was a general practitioner who consulted with Plaintiff only once for the

purpose of providing a report.  The Second Circuit "ha[s] repeatedly 'cautioned that ALJs should

not rely heavily on the findings of consultative physicians after a single examination.'"  *Rucker*,

48 F.4th at 94 (quoting *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013)); *see Schillo v.

Kijakazi*, 31 F.4th 64, 77 n.5 (2d Cir. 2022) ("[I]t can be problematic when an ALJ affords [the

findings of a consultative physician] more weight than a treating physician's findings.").

Finally, the ALJ found Dr. Bartlett's opinion unpersuasive because it was "inconsistent

with . . . [Plaintiff's] mostly normal physical exam, with intact neurological exam, as well as

other physical exams of [Plaintiff] showing normal gait and intact strength and sensation," and

"inconsistent with [Plaintiff's] reported daily activities, including handling his own personal

care, going biking and swimming, doing household chores, repairing cars[,] and driving."  (AR

23 (citations omitted).)  These findings are not supported by substantial evidence.  The medical

record contains many reports from treating and consulting medical providers stating that Plaintiff

walked with an antalgic gait principally due to problems with his prosthesis, and that Plaintiff's

right leg was shortened and his right knee deformed.  (*See, e.g.*, AR 444 (Physical Therapist

Zafir Bludevich assessing that "[Plaintiff's] pain may[ ]be due to his [right] . . . prosthetic which

causes him to amb[ulate] with an abnormal ga[it] . . . [and] to sway[] to his [right]"), 559

(Dr. Morrison recording that Plaintiff has an "[a]bnormal gait because of [his] amputation and

prosthesis"), 560 (Dr. Morrison stating that "[Plaintiff] was missing a bone in his leg[, which]

. . . affects his gait"), 637 (Certified Prosthetist Jason Lalla noting that Plaintiff had "[k]nee instability," "[p]ain reported to be a result of poor alignment," [p]rosthetic gait deviations," "[u]neven step length (short prosthetic side)," "antalgic gait," and "below average physical function"), 764 (Certified Prosthetist Robert Stamm stating that "current prosthesis is not fitting properly due to volume loss and anatomical changes in residual limb"), 795 (Joseph Theriault, MD, finding that Plaintiff "walks with an antalgic gait," "[Plaintiff's] right thigh is shorter than [the] left[] while [his] prosthetic right leg is longer than his left leg," and "[Plaintiff's hip bone] is elevated on the right"), 821 (Physical Therapist Eric Darling recording that "[Plaintiff] walks with modified independence with his prosthesis . . . [and] . . . presents with gait deviations: lateral trunk lurch to right during stance on the right, drop off to the left at initial contact on the left, slightly forward lean in addition to lateral trunk lurch to right during stance on right, decreased stance time right lower extremity"), 853 (Doctor of Physical Therapy Theresa Maureen stating that "[Plaintiff's] prosthesis is not fitting well"; "[Plaintiff's] [d]istal medial stump has excessive pressure"; "[Plaintiff] has had difficulty with this pro[s]thesis for some[]time"; and "[Plaintiff has] pain in [his] knee and residual stump [and] gait disturbance").)

Substantial evidence also does not support the ALJ's finding that Dr. Bartlett's opinion that Plaintiff could stand/walk for less than two hours is inconsistent with Plaintiff's daily activities, including handling his own personal care, biking, swimming, doing household chores, repairing cars, and driving.  First, a limitation to standing/walking for less than two hours would not preclude any of these activities, as none of them necessarily requires standing or walking for two hours or longer.  Second, there is no evidence that Plaintiff did any of these activities during the relevant period for two hours or longer.  Third, regarding Plaintiff's ability to do household chores, Plaintiff stated in a Function Report that, although he is able to do a "few" household

chores (AR 354), he only does "what [he] need[s] to do"; he is in pain while doing them; and he cannot do "anything that is . . . the least bit strenuous without problems" (AR 331).  Fourth, one of the few references to Plaintiff "biking" during the relevant period is Plaintiff's own statement in a Function Report that one of his "hobbies and interests" was "biking."  However, in response to the question "How often and how well do you do th[is]?," Plaintiff stated: "poorly" and "not often enough" because "[l]ong periods of time with [my] prosthetic on [are] [a]wful."[8]  (AR 333.)  Based on a full review of the record, Plaintiff does not appear to have been able to ride a bike for any sustained duration during the relevant period.  In fact, in both of Plaintiff's Function Reports, he left blank the box next to "Ride a bicycle" as a method of travel "[w]hen going out." (AR 332, 374.)  Regarding driving, Plaintiff stated in a Function Report that his car has been modified to permit him to use a left foot accelerator.  (AR 332.)  It is unclear how Plaintiff's ability to drive a car with an accelerator modified for use with only the left leg demonstrates an ability to stand/walk for two hours or more in an eight-hour workday.

With respect to Plaintiff's ability to repair cars, the record as a whole does not suggest that Plaintiff spent much time engaged in that activity during the relevant period.  For example, a December 2020 record from Long Trail Physical Therapy states that Plaintiff "enjoys working on cars and would like to make a job out of it but feels that he can't due to his improperly fitted prosthesis."  (AR 923.)  Likewise, a November 2019 record from Richmond Family Medicine notes that, although Plaintiff "loves working on cars," "attended a tech program and has a student mechanics license," and "would like to open a[n automobile] shop some[]day"; he "feels stuck because of the pain from his leg and lack of transportation."  (AR 592.)  In a March 2020

---

[8]  Plaintiff also applied these qualifiers—"poorly" and "not often enough" because "[l]ong periods of time with [my] prosthetic on is [a]wful"—to his other "hobbies and interests," including learning about cars, gardening, and swimming.  (AR 333.)

Function Report, Plaintiff's mother reported that one of Plaintiff's hobbies or interests is

"[f]ixing cars" but stated that Plaintiff only engaged in that activity "when he [was] not in pain."

(AR 375.)  Similarly, in a July 2019 Function Report, Plaintiff stated that one of his hobbies or

interests was "[l]earning about cars."  (AR 333.)  Taken together, these records say nothing about

whether Plaintiff was actually able to work on cars during the relevant period, in what capacity,

and for how long.

The record supports the observations contained in a March 2020 Richmond Family

Medicine treatment note regarding Plaintiff's capacity for activities of daily living:

> [Plaintiff] continues to have difficulty with most activity because of the pain he is
> experiencing from the poor fit of his prosthetic leg.  [He] reports that he will do
> something until he can no longer stand the pain.  Even sitting and petting his dog
> eventually leads to excruciating pain.  Beyond the daily pain, this has been difficult
> because [Plaintiff] has always been very active. . . .  [Now,] he has been unable to
> participate in . . . activities [like sports, hiking, and working] due to pain.

(AR 744.)

For these reasons, the ALJ erred in his analysis of the medical opinions of Dr. Bartlett,

Dr. Knisely, and Dr. White regarding Plaintiff's ability to stand/walk.  This error requires

remand, as an ALJ's "flawed evaluation of medical opinion evidence . . . impacts the ALJ's

assessment of a claimant's [RFC]."  20 C.F.R. § 416.945(a)(3) ("We will assess your [RFC]

based on all of the relevant medical and other evidence."); *see Sarah B. W. v. Kijakazi*, 8:21-cv-

50 (TWD), 2022 WL 16734988, at *12 (N.D.N.Y. Nov. 7, 2022) (remanding because "ALJ's

errors in evaluating the medical opinion of [a consulting psychiatrist] necessarily influenced [the

ALJ's] evaluation of Plaintiff's symptoms[,] . . . [and] [t]hose errors also influenced the ALJ's

evaluation of Plaintiff's [RFC]" (citations omitted)); *Rodriguez v. Colvin*, No. 3:14-CV-1552,

2016 WL 1275647, at *7 (N.D.N.Y. Mar. 31, 2016) ("Because the ALJ erred in awarding

significant weight to [the nonexamining agency consultant's] opinion, the ALJ's RFC assessment is necessarily flawed.").

## II.     Limitation to One- to Two-Step Tasks in Low Production Jobs

Plaintiff contends that the ALJ erred in his RFC determination by failing to limit Plaintiff to (a) one- to two-step tasks (b) in a low production job (c) that requires only infrequent interactions with coworkers and supervisors.  (Doc. 15-1at 26).

### A.     One- to Two-Step Tasks

The Court agrees that the ALJ erred in failing either to include a limitation to one- to two-step tasks or explain why he omitted that limitation.  Each of the psychological agency consultants who reviewed the record—including Howard Goldberg, PhD; Thomas Reilly, PhD; and Paul Cherry, PhD—opined that Plaintiff had the concentration, persistence, and pace for only one- to two-step tasks in a low production setting.  (*See* AR 91, 109, 134, 157, 692.)  The ALJ found these opinions "persuasive" on the grounds that they were "generally consistent with the treatment notes and exams," and "in light of th[ese consultants'] medical expertise, knowledge of Social Security disability regulations[,] and their thorough review of the medical records."  (AR 23.)  However, the ALJ excepted from his finding the consultants' opinion that Plaintiff is restricted to low production jobs.  (*Id.*)  The ALJ did not include a similar exception with respect to the consultants' opinion on Plaintiff's limitation to only one- to two-step tasks.

The ALJ found "persuasive" the consultants' uniform opinion that Plaintiff was limited to one- to two-step tasks.  The record contains no other medical opinion contradicting this opinion.  Nevertheless, the ALJ did not include a one- to two-step-task limitation in either his hypothetical to the VE or his RFC determination, nor did he explain this omission in his decision.  The ALJ is not required to accept all parts of an agency consultant's opinion.  *See Matta v. Astrue*, 508 F.

App'x 53, 56 (2d Cir. 2013).  In this case, however, the ALJ found persuasive the opinions of

Drs. Goldberg, Reilly, and Cherry—with the noted exception of the "low production" portion of

their opinions—and yet did not include the "one- to two-step tasks" portion of their opinions in

his RFC determination.  The ALJ provided no explanation for that omission.  The Court is

unable to decipher whether the ALJ intentionally or mistakenly excluded the limitation, and, if

intentionally, the basis for the exclusion.  In the absence of this information, the Court must

remand so that the ALJ may either include a limitation to one- to two-step tasks in his RFC

determination, or explain why the agency consultants' uniform opinion on that issue is

unpersuasive.  *See Schlattman v. Colvin*, Case No. 12 C 10422, 2014 WL 185009, at *8 (N.D. Ill.

Jan. 14, 2014) (noting that, "[although] it is possible that the ALJ may have consciously chosen

to omit the one- to two-step limitation, . . . there is no language in the ALJ's opinion to that

effect and therefore no logical bridge that allows this Court to determine whether the failure to

include the limitation was a conscious decision or a lapse in judgment" (citation and internal

quotation marks omitted)); *see also Adesina v. Astrue*, No. 12–CV–3184 (WFK), 2014 WL

5380938, at *11 (E.D.N.Y. Oct. 22, 2014) ("The ALJ is not free to arbitrarily substitute his own

judgment for competent medical opinion.  The ALJ's failure to explain how the evidence

supported the RFC finding she reached frustrate[s] meaningful review, and remand could be

appropriate on this basis alone." (alteration in original) (citations and internal quotation marks

omitted)).

The ALJ's omission of the limitation to one- to two-step tasks in his RFC determination

is not harmless error.  All the jobs identified by the VE as appropriate for a hypothetical claimant

with Plaintiff's limitations (*see* AR 25) require a Reasoning Level of Two or Three.  (*See* Doc.

15-2 (document preparer/microfilming job requiring Reasoning Level Three), Doc. 15-3

(polisher/eyeglass framer job requiring Reasoning Level Two), Doc. 15-4 (surveillance-system monitor job requiring Reasoning Level Three), Doc. 19-1 (marker job requiring Reasoning Level Two), Doc. 19-2 (assembler of small products II job requiring Reasoning Level Two).)  Jobs demanding a Reasoning Level of Two or Three require an ability to perform more than one- to two-step tasks.  *See Daniel M. v. Kijakazi*, Civil Action No. 2:21-cv-243, 2023 WL 154909, at *3 n.1 (D. Vt. Jan. 11, 2023) (citing *McGriff v. Colvin*, No. 3:16-CV-911 (JAM), 2017 WL 3142336, at *3 (D. Conn. July 25, 2017) (holding that Reasoning Levels Two and Three are not consistent with an RFC finding of a limitation to "simple, one-to-two step tasks," as that limitation "essentially tracks the limitations for [R]easoning Level One (the ability to '[a]pply commonsense understanding to carry out simple one- or two-step instructions') rather than for [R]easoning Levels Two or Three (which impose no limitation on the number of steps or instructions that an employee must be able to follow)" (second alteration in original)); *Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 560 (8th Cir. 2018) ("The court recognized that the ALJ's reference to '1 to 2 step tasks' corresponded to Level [One] Reasoning, creating an apparent conflict between the [VE's] testimony [identifying a Level Three job] and the [DOT].""); *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1003 (9th Cir. 2015) ("There was an apparent conflict between [the plaintiff's] RFC, which limits her to performing one- and two-step tasks, and the demands of Level Two reasoning, which requires a person to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" (second alteration in original) (quoting *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015)); *Carpenter v. Colvin*, Case No. 1:13–cv–01637 (CKK/GMH), 2016 WL 946975, at *7 (D.D.C. Feb. 24, 2016) ("The ALJ's instruction that the hypothetical plaintiff was limited to 'simple, routine, repetitive, one to two step tasks' conflicts with DOT Reasoning Level Two, which is

required for both jobs identified in the VE's testimony."), *report and recommendation adopted*, 2016 WL 953216 (Mar. 14, 2016))); *see also Trujillo v. Colvin*, No. 3:13–cv–0620–SI, 2014 WL 2213218, at *5 (D. Or. May 27, 2014) ("The weight of authority . . . finds that the addition of the specific wording relating to 'one- or two-step instructions' is more restrictive and correlates precisely with the phrasing used in the DOT's definition of Reasoning Level [One], thereby rendering an RFC using this specific language compatible only with Reasoning Level [One] jobs." (citing cases)).

Therefore, assuming the consultants' opinion that Plaintiff is limited to one- to two-step tasks is adopted, Plaintiff could not perform any of the jobs listed at step five of the ALJ's decision.

### B.    Low Production Jobs

The ALJ also did not incorporate in his RFC determination the opinion of Drs. Goldberg, Reilly, and Cherry that Plaintiff was limited to performing only "low production" work. Substantial evidence does not support the ALJ's stated rationale for excluding this limitation. The ALJ reasoned that "[Plaintiff's] exams show[] normal concentration and attention"; "his reported daily activities includ[e] conducting research on[]line for hours at a time, completing chores, watching television, playing video games, [and] looking for jobs"; and "he is a skilled mechanic[,] . . . enjoys . . . repairing cars[,] and would like to get a job working on cars."  (AR 23.)  But the record does not support the ALJ's depiction of Plaintiff's activities or the ALJ's statement that Plaintiff demonstrated normal concentration and attention on examination.

With respect to Plaintiff's daily activities, for example, the ALJ mentions several times in his decision Plaintiff's ability to repair cars.  (*See* AR 15, 19, 21, 22, 23, 24.)  As noted above, however, the record does not indicate that Plaintiff spent very much time working on cars during

the relevant period.  Likewise, the record does not indicate that Plaintiff spent extensive time researching online (i.e., browsing the web), watching television, or playing video games during the relevant period.  An ability to do any of these activities for a short period of time does not necessarily correspond to an ability to perform more than a low production job.  Regarding Plaintiff's ability to concentrate and maintain attention, ample record evidence demonstrates that Plaintiff has on multiple occasions struggled to maintain concentration and attention, stay focused, and socialize even at his regular medical appointments.  (*See, e.g.*, AR 770–73.)  The record documents the following: in September 2019, Plaintiff "was unable to talk with" his mental health provider, "became tearful," and "stormed off[,] slamming the door" (AR 684); in November 2019, Plaintiff "got very stressed out on a couple of occasions and walked out of the room" when his mental health provider tried to help Plaintiff with his disability claim appeal paperwork (AR 675); in December 2019, Plaintiff "failed to make eye contact consistently [with his medical provider at an appointment], was back and forth between looking on his phone[,] . . . seemed to be relatively disconnected," and "seemed to shut down more as the appointment went on" (AR 634); in July 2020, Plaintiff "basically refused care and/or made it impossible [for his medical provider] to work with him," and "became extremely upset and was crying in [the] lobby" after he left his appointment, ultimately "slam[ming] through the door in the foyer area [of the medical office] and . . . destroying the automatic door opening mechanism" (AR 803, 804); and in September 2020, Plaintiff was "extremely irritable," "discontinued [a] conversation [with his treating nurse] abruptly," and "left [the office] due to feeling sick" (AR 723).

The record supports Drs. Goldberg, Reilly, and Cherry's opinion that Plaintiff is limited to one- to two-step tasks in a low production job.  Therefore, remand is required for the ALJ to reexamine his RFC determination.

**III.     Jobs Existing in Significant Numbers in the National Economy**

Plaintiff argues that substantial evidence does not support the ALJ's step-five findings

regarding jobs existing in significant numbers in the national economy.  Specifically, with

respect to the ALJ's finding that Plaintiff is able to perform the job of "document preparer,"

Plaintiff argues that this job "has been considered obsolete by most, if not all, courts that have

addressed the issue, including a number of courts within the Second Circuit."  (Doc. 15-1 at 31

(citing *Corey S. v. Comm'r of Soc. Sec.*, 5:20-CV-0678 (ML), 2021 WL 2935917, at *10

(N.D.N.Y. July 13, 2021) ("[A]n increasing number of courts have recognized the obsolete

nature of the document preparer position and remanded for further administrative proceedings

where there is no record evidence of other jobs existing in significant numbers that a plaintiff can

perform.")).)  The Commissioner does not offer a counter argument, instead claiming that any

ALJ error regarding the document-preparer job is "no more than harmless error since the ALJ

found other occupations that [Plaintiff] could perform that exist in significant numbers in the

national economy."  (Doc. 17 at 14.)  Given that the Commissioner has not disputed the claim of

error as to the document-preparer job, I find that the ALJ erred in concluding at step five of the

sequential analysis that Plaintiff could perform that job.  *See Poupore*, 566 F.3d at 306 (holding

that it is the Commissioner's burden at step five to "show that there is work in the national

economy that the claimant can do").

Plaintiff further argues that the ALJ's finding that Plaintiff is able to perform the job of

"surveillance system monitor" is "clearly inappropriate," given Plaintiff's "significant emotional

issues" and "problems with concentration."  (Doc. 15-1 at 32, 33.)  The Commissioner has not

refuted this claim or error either.  (*See* Doc. 17 at 13–14)  I therefore find that the ALJ erred in

determining that Plaintiff could perform the surveillance-system-monitor job.

Without the document-preparer and surveillance-system-monitor jobs, Plaintiff contends "there would be insufficient numbers of jobs that [he] could perform." (Doc. 15-1 at 20; *see id.* at 33–34; *see also* Doc. 19 at 6–8.) Given that remand is required for the reasons stated above, the Court need not decide this issue. *See Wilson v. Comm'r of Soc. Sec.*, 1:16-CV-77, 2017 WL 1194229, at *6 (N.D.N.Y. Mar. 30, 2017) ("Because remand is recommended for the reasons discussed above, remand is also recommended for a new analysis at step five."); *Anthony A. v. Comm'r of Soc. Sec.*, 3:20-CV-00943 (TWD), 2022 WL 806890, at *8 (N.D.N.Y. Mar. 17, 2022) ("Because remand is required, the Court declines to reach findings on issues related to the RFC and step five determinations."). On remand, after reexamining the relevant medical opinions and Plaintiff's daily activities, the ALJ will determine Plaintiff's RFC and make new step-five findings.

**IV.    Date Last Insured**

Plaintiff claims the ALJ erroneously stated in his decision that Plaintiff had a DLI of June 30, 2019 (*see* AR 10, 12), when in fact Plaintiff's certified earnings record shows that his DLI is September 30, 2019 (*see* AR 287). The Commissioner concedes that the correct DLI for Plaintiff is September 30, 2019, and that the ALJ misstated Plaintiff's DLI as June 30, 2019 in his decision. (Doc. 17 at 16.) But the Commissioner argues that Plaintiff has failed to show that this misstatement prejudiced him because the ALJ determined that Plaintiff was not disabled through March 23, 2021; and thus, even if the statement in the ALJ's decision was corrected to indicate that Plaintiff's DLI is September 30, 2019, that would not change the outcome for Plaintiff. (*Id.*) The Commissioner asserts that because no prejudice is shown, remand is not required.

Given the Court's decision to remand this matter for other reasons, this issue is largely moot.  Nonetheless, the Commissioner is directed to include the correct DLI of September 30, 2019 in his new decision on remand.

## Conclusion

For these reasons, the Court GRANTS Plaintiff's motion (Doc. 15), DENIES the Commissioner's motion (Doc. 17), and REMANDS for further proceedings and a new decision in accordance with this Opinion and Order.

Dated at Burlington, in the District of Vermont, this 25th day of October 2023.

_/s/ Kevin J. Doyle_____
Kevin J. Doyle
United States Magistrate Judge